IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

**FILED**

AUG 0 8 2018

Clerk, U.S. District Court
District Of Montana
Helena

TRACY BOWEN GORNIAK,
Individually and as Personal
Representative of THE ESTATE OF
VINCENT DEMERS,

Plaintiff,

vs.

MICHAEL WHARTON, in his individual
capacity and as sheriff's deputy, MIKE
JOHNSON, in his individual capacity and
as undersheriff, JEFFERSON COUNTY
SHERIFF DEPT., JEFFERSON
COUNTY, and DEFENDANTS 1-10,

Defendants.

CV 16–103–H–CCL

**OPINION
&
ORDER**

Before the Court is the motion for summary judgment of Defendants

Michael Wharton, Mike Johnson and Jefferson County. Having reviewed the

briefs and the record and no party having requested oral argument, the Court is

prepared to rule.

**STANDARD OF REVIEW**

Fed.R.Civ.P. 56(a) permits a party to seek summary judgment "identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." A district court may grant summary judgment as to particular claims or defenses when one of the parties is entitled to judgment as a matter of law. Summary judgment or adjudication is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assn.,* 809 F.2d 626, 630 (9th Cir.1987). The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita,* 475 U.S. at 586, n. 11.

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters. Fed.R.Civ.P. 56(a), (c); *see also, Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence of the party opposing summary judgment is to be believed and all reasonable inferences from the facts must be drawn in favor of the opposing party. *Anderson,* 477 U.S. at 255; *Matsushita,* 475 U.S. at 587. The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252.

The moving party, in supporting its burden of production, "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.,* 210 F.3d 1099, 1102 (9th Cir.2000). A "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" to entitle the moving

3

party to summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire,* 210 F.3d at 1102. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.

Once the moving party has met its initial burden, the burden shifts to the non-moving party to establish the existence of a general issue of material fact. *Matsushita,* 475 U.S. at 586 – 87. The non-moving party may not rely on the allegations or denials of its pleadings but must cite to facts in the record. Fed. R. Civ. P. 56(c)(1); *Matsushita,* 475 U.S. at 586, n. 11. Either party may object to the facts presented by the other party on the grounds that the material cited is not admissible. Fed. R. Civ. P. 56(c)(2).

/ / /

/ / /

**STATEMENT OF FACTS[1]**

First Encounter

While patrolling in Whitehall, Montana on November 8, 2013, Sheriff's Deputy Michael Wharton (Deputy Wharton) observed a man in a white hooded sweatshirt and white shorts, later identified as Vincent DeMers (Mr. DeMers), get into a white Infiniti parked in the Town Pump parking lot, pull out of that spot and pull into another spot. (Doc. 18, Plaintiff's Statement of Disputed Facts, at ¶ 1). Deputy Wharton drove south of the Town Pump and stopped at a location where he could observe the Infiniti, which pulled out of the Town Pump lot and began traveling south. (Doc. 18 at ¶ 2).

Deputy Wharton followed the Infiniti and observed its driver park next to and enter another convenience store. (Doc. 18 at ¶ 2). While the driver was inside, Deputy Wharton learned that the Infiniti was registered to Mr. DeMers, whose license had been revoked. The driver came out of the store without having apparently purchased anything. (Doc. 18 at ¶ 3).

---

[1] Because Plaintiff opposes summary judgment, the Court accepts as true all facts for which Plaintiff provides support in the record and draws all reasonable inferences in favor of Plaintiff. *Anderson,* 477 U.S. at 255.

Deputy Wharton had pulled into position along Legion Street, facing

eastbound, to see where the Infiniti would go. (Doc. 19-3, Inquest Tr., at 21:19 –

21). The driver pulled out going westbound and, immediately upon seeing the

patrol car, turned into the alley alongside the Cowdrey Apartments." (Doc. 19-3 at

21:22 – 24). Deputy Wharton activated his emergency lights to stop the Infiniti

and investigate whether it was being driven by its owner, whose license had been

revoked. (Doc. 18 at ¶ 4). The stop occurred around 9:30 or 9:45 at night. (Doc.

19-3 at 22:7).

Between 9 and 9:30 that evening, Mr. DeMers had called his friend Austin

Mariah Senst (Ms. Senst) for directions to her apartment in Whitehall. (Doc. 19-1,

Senst Aff., at ¶ 4). Although the location of Ms. Senst's apartment is not

identified in the materials provided to the Court, the Court draws the reasonable

inference that Ms. Senst's apartment was located in the Cowdrey Apartments.

The Infiniti pulled into a parking space beside the Cowdrey Apartments and

the driver exited before Deputy Wharton could stop the patrol car. (Doc. 19-3 at

22:10 - 13). Plaintiff identifies the person riding with Deputy Wharton as Kristy

Burns, "the dispatch ride-along." (Doc. 18 at ¶ 5). The Court will refer to this

6

woman as Ms. Burns because a woman identified as Christi Burns testified at the Coroner's Inquest. ( Doc. 17-2 at 1, Index to Inquest Tr.). According to Ms. Burns, the driver "had some items in his hands, and when he opened the car door, he had his right arm laying above the car door, and he . . . asked Deputy Wharton why." (Doc. 19-3 at 22:20 - 24). The driver said no after Deputy Wharton told him to put his hands up again. (Doc. 19-3 at 23:1 - 3). After Deputy Wharton repeated his command for a third time, the Infiniti driver "turned, flung the car door shut, and ran." (Doc. 19-3 at 23:5 - 8) According to Deputy Wharton, he "got out of [his] patrol car with [his] gun drawn, but not pointed at DeMers, and ordered DeMers to show his hands. Demers refused to comply and, after the third command, began running. [Deputy Wharton] holstered [his] gun and chased DeMers, but was unable to catch him." (Doc. 17-1, Wharton Aff., at ¶ 8).

Plaintiff alleges that there is disputed testimony as to whether Deputy Wharton had his weapon pointed at Mr. DeMers, relying on a statement made by Mr. DeMers to his friend, Ms. Senst. (Doc. 18 at ¶ 6). Defendants correctly point out that Plaintiff is relying on Mr. DeMers's out-of-court statement to prove that the gun was pointed at Mr. DeMers – i.e. to prove the truth of the matter asserted. Because the issue of whether Ms. Senst could be permitted to testify about Mr. DeMers's statement based on an exception to the hearsay rule has not been fully

briefed, the Court will assume for purposes of this motion that Deputy Wharton

pointed his drawn gun at Mr. DeMers at some point during their first encounter.

Events Following First Encounter

Deputy Wharton returned to his patrol car and contacted Undersheriff

Johnson after losing sight of the Infiniti driver. (Doc. 18 at ¶ 7). When Deputy

Wharton, following Undersheriff Johnson's instruction, went to impound the

Infiniti as evidence of a crime, Deputy Wharton looked through the car windows

and saw a magazine for an automatic pistol sticking out from under the driver's

seat and a pair of brass knuckles on the front seat. (Doc. 18 at ¶ 8). Deputy

Wharton retrieved the magazine, which was loaded with ammunition, along with

the brass knuckles and a box containing ammunition. Deputy Wharton then had

the Infiniti towed to the impound lot and secured. (Doc. 18 at ¶ 9).

Deputy Wharton returned home when his shift ended. (Doc. 18 at ¶ 10). At

2:30 a.m., about one-half hour after his shift ended, Deputy Wharton responded to

a call from dispatch that a man was trying to wave down traffic on Interstate 90.

(Doc. 18 at ¶ 11).

Second Encounter

When Deputy Wharton got to the area where the man had been reported as

possibly endangering himself by attempting to flag down traffic, Deputy Wharton

8

saw a man he refers to as DeMers standing by the side of the westbound lane of Interstate 90 (I 90). (Doc. 17-1, Wharton Aff., at ¶ 13). Plaintiff alleges that Deputy Wharton knew only that the man he saw on the side of I 90 was wearing a white hoody similar to the one he observed on the suspect earlier that evening. (Doc. 18 at ¶ 13). Although Deputy Wharton's affidavit does not state when he recognized the man he saw on I 90 as the suspect he saw earlier that evening, it is clear that Deputy Wharton recognized the man he saw on I 90 as the man who had been driving the Infiniti and had run away from a traffic stop, leaving behind a loaded magazine and ammunition. It was therefore reasonable for Deputy Wharton to suspect that the man he saw could be armed.

Deputy Wharton pulled over to the side of the westbound lane, but did not turn on his emergency lights, and got out of his patrol car with his taser drawn. (Doc. 18 at ¶ 13). Mr. DeMers began walking toward the patrol car and took his hands out of his pockets, as instructed by Deputy Wharton. (Doc. 18 at ¶ 14). After starting to comply with Deputy Wharton's order to go to the passenger side of the patrol car, Mr. DeMers turned and began running west, along the westbound lanes. (Doc. 18 at ¶ 15). Deputy Wharton fired his taser at Mr. DeMers and missed. (Doc. 18 at ¶ 16).

///

As Deputy Wharton was getting into his patrol car, Mr. DeMers turned and began running south, across the westbound lanes. (Doc. 18 at ¶ 17). Deputy Wharton turned on his emergency lights and began crossing the median. As Deputy Wharton was crossing the median, Mr. DeMers ran into the eastbound lanes of I 90 and was struck by an eastbound vehicle. Deputy Wharton's first aid efforts were unsuccessful and Mr. DeMers died at the scene. (Doc. 18 at ¶ 18).

**PLAINTIFF'S CLAIMS**

Plaintiff Tracy Bowen Gorniak (Ms. Gorniak) brings this case on behalf of herself and as personal representative for the estate of her deceased son, Mr. DeMers. The term "plaintiff" is used in both the singular and plural in the First Amended Complaint and other documents filed by Ms. Gorniak. For the sake of consistency, the Court will refer to Plaintiff in the singular.

In Count I of the First Amended Complaint, Plaintiff alleges that Deputy Wharton violated Mr. DeMers's right to be free from unreasonable seizure under the Fourth and Fourteenth Amendment by using excessive force in his two encounters with Mr. DeMers on November 8 and 9 of 2013 and that the excessive force caused Mr. DeMers to run across I 90 until he was hit by an SUV. (Doc. 7, First Amended Compl., at ¶¶ 16 - 24, 27 - 29). Plaintiff also alleges that Defendants Jefferson County and Jefferson County Sheriff's Department

10

established policies, patterns and practices that caused the violation of Mr. DeMers's rights, that individuals with final decision making authority acted in conscious disregard for the need to properly train, supervise, and discipline the employees of Jefferson County and the Jefferson County Sheriff's Department, and that individuals with final decision making authority endorsed Deputy Wharton's use of excessive force. (Doc. 7 at ¶¶ 30 - 33). Undersheriff Mike Johnson is the only individual other than Deputy Wharton identified in Plaintiff's' First Amended Complaint and is named in both his individual and official capacity.

Plaintiff raises claims under Montana state law in the remaining counts of the First Amended Complaint. Plaintiff alleges in Count II that the conduct giving rise to Defendants' alleged violation of Mr. DeMers's federal constitutional rights also violated his rights under the Montana Constitution. (Doc. 7 at ¶¶ 36 - 39). Plaintiff alleges in Count III that Defendants' negligence caused the death of Mr. DeMers and alleges in Count IV that Defendants' negligence caused Mr. DeMers to suffer severe emotional distress before his death. In Count V, Ms. Gorniak seeks damages on her own behalf for her loss of her son's comfort and society and for her grief, sorrow, and mental anguish following the alleged wrongful death of her son.

## DEFENDANTS' SUMMARY JUDGMENT MOTION

Deputy Wharton contends that he is entitled to summary judgment as to Plaintiff's excessive force claim against him because the undisputed facts demonstrate that his use of force was objectively reasonable and that his conduct did not violate clearly established law. Undersheriff Johnson argues that he is entitled to summary judgment as to the claim against him in his individual capacity because the first amended complaint contains no allegations which demonstrate that he engaged in conduct that caused Deputy Wharton's alleged use of excessive force. Jefferson County contends that it is entitled to summary judgment because its employee did not use excessive force against Mr. DeMers in violation of his constitutional rights. Alternatively, Jefferson County argues that Plaintiff failed to allege specific facts to support the general allegation that Jefferson County implemented policies or practices that caused Deputy Wharton to use excessive force during his encounters with Mr. DeMers.

Defendants contend they are entitled to summary judgment as to Plaintiff's Montana constitutional tort claim because their actions did not violate Mr. DeMers's rights under the Montana constitution and because Plaintiff has other, adequate remedies. Defendants contend that Plaintiff's negligence and wrongful death claims are barred by the public duty doctrine.

**FEDERAL CLAIMS**

Plaintiff's 42 U.S.C. § 1983 Claim against Deputy Wharton

In deciding whether Deputy Wharton used excessive force during his two encounters with Mr. DeMers, the Court uses the framework set forth in *Graham v. Connor*, 490 U.S. 386 (1989). The Court must balance "'the nature and quality of the intrusion'" on Mr. DeMers's rights "against the countervailing government interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 1699 (1985)). The proper application of the *Graham* test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Id.*

First Encounter

Deputy Wharton effected his investigative traffic stop without using any force – he activated his emergency lights. Contrary to Plaintiff's contention, that stop was justified because Deputy Wharton reasonably believed that the Infiniti was being driven by its owner, and he knew the owner's license had been revoked.

Deputy Wharton got out of his patrol car with his gun drawn after Mr. DeMers jumped out of the Infiniti. For purposes of this motion, the Court accepts

Plaintiff's contention that Deputy Wharton pointed his drawn gun at Mr. DeMers at some point during their first encounter. Pointing a loaded gun at a suspect involves a high level of force. *Thompson v. Rahr*, 885 F.,3d 582, 586 (9th Cir. 2018).

The Court must next consider whether the level of force was justified by the government interest, considering the severity of the suspected crime, the danger posed by the suspect, and whether the suspect was resisting arrest or attempting to escape. *Id.* At the time of his first encounter with Mr. DeMers, Deputy Wharton was investigating a traffic offense. While a traffic offense is not a serious crime, the United States Supreme Court recognizes that there is a potential danger whenever an officer makes a traffic stop and that the risk of harm to the officer and the occupants of a vehicle is minimized when the officer takes command of the situation. *Arizona v. Johnson*, 555 U.S. 323, 330 (2009). It was reasonable for Deputy Wharton to draw his gun and order Mr. DeMers to show or put up his hands when Mr. DeMers jumped out of his car.

The situation escalated because Mr. DeMers refused to comply with Deputy Wharton's commands to show his hands. There is no dispute about the fact that at least one of Mr. DeMers's hands was not visible to Deputy Wharton. This was not a case of an officer pointing a gun at a compliant and clearly unarmed individual.

14

Even if a jury could find that Deputy Wharton used excessive force during his first encounter with Mr. DeMers, Deputy Wharton is entitled to summary judgment on the basis of qualified immunity. Qualified immunity protects a government official from civil liability unless the official's conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (*per curiam*) (quoting *White v. Pauly*, 137 S.Ct. 548, 551 (2017)). Given the fact intensive inquiry involved in deciding excessive force cases, law enforcement officers sued for using excessive force "are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Id.* at 1153.

To overcome Deputy Wharton's qualified immunity defense, Plaintiff must demonstrate that Deputy Wharton violated clearly established rights. *Vos v. City of Newport Beach*, 892 F.3d 1024, 1035 (9ᵗʰ Cir. 2018). To meet this burden, Plaintiff must cite precedent that could have been known to Deputy Wharton prior to November 8, 2013, that would have placed the issue of whether Deputy Wharton acted reasonably "beyond debate." *Id.* Plaintiff failed to meet this burden, citing two cases that bear no factual similarity to the instant case.

The defendant law enforcement officers in *Estate of Simpson v. Yellowstone County* were following an Explorer that they thought matched the description of a

15

stolen Explorer possibly driven by someone who may have been involved in a burglary "that had occurred hours earlier and that they had not yet investigated.". 229 F. Supp. 3d 1192, 1197 (D. Mont. 2017). The officers did not attempt to conduct a traffic stop because they were unable to keep up with the Explorer on a snow-covered and winding road. *Id.* at 1198. Instead, after learning that the road was a dead-end, they waited in the middle of the road for the Explorer to return. *Id.* at 1199. "Despite not knowing who was driving the Explorer, whether it contained any passengers, and having no reason to believe the driver was armed," the officers loaded a shot gun and an assault rifle, which they fired at the Explorer. *Id.* One of the many shots fired by the officers killed Simpson. *Id.* at 1200.

This Court, acting through the Honorable Susan P. Watters, rejected the officers' qualified immunity defense, finding that "any reasonable officer would recognize that using deadly force to effect a *Terry* stop violates clearly established law." *Id.* at 1208. As explained above, Deputy Wharton used no force to effect his investigative (*Terry*) stop of the Infiniti – he simply turned on his emergency lights. His conduct cannot be compared to that of the officers who used deadly force to effect a traffic stop in *Estate of Simpson*.

Plaintiff argues that Deputy Wharton should have known that drawing and pointing his gun at Mr. DeMers was unreasonable because the Ninth Circuit has

16

"recognized that '[w]here there is no need for force, any force used is constitutionally unreasonable.'" (Doc. 19 at 19, quoting *Headwaters Forest Defense v. County of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000)). The plaintiffs in *Headwaters* were non-violent protesters who "linked themselves together with self-releasing lock-down devices known as 'black bears'" to protest the "logging of ancient redwood trees in the Headwaters Forest." *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125, 1127-28 (9th Cir. 2002) (*reaffirming* 240 F.3d 1185, following remand by the United States Supreme Court). The defendants in *Headwaters* were the county sheriff and chief deputy who authorized the use of pepper spray on the plaintiffs. *Id.* at 1127. When viewed in the light most favorable to the protestors, the facts showed that the "protestors were sitting peacefully, were easily moved by the police, and did not threaten or harm the officers." *Id.* at 1130. The Ninth Circuit held that the defendants were "not entitled to qualified immunity because the use of pepper spray on the protestors' eyes and faces was plainly in excess of the force necessary under the circumstances, and no reasonable officer could have concluded otherwise." *Id.* at 1131.

A case finding that no force was necessary against a seated and immobilized individual engaged in a peaceful protest cannot be extended to the instant case.

Mr. DeMers jumped out of his car and refused to show his hands, at least one of which was concealed from Deputy Wharton's view, in response to repeated commands. A reasonable officer could view Mr. DeMers's action as aggressive.

Plaintiff may be able to present evidence that the force used by Deputy Wharton in his first encounter with Mr. DeMers consisted of pointing a loaded gun at Mr. DeMers after pulling him over for a traffic violation. In another case involving an officer pointing a loaded gun during a traffic stop, a deputy sheriff (Copeland) pulled the plaintiff (Thompson) over for multiple traffic violations. *Thompson*, 885 F.3d at 587. Thompson, like Mr. DeMers, had a suspended license. He was also a convicted felon, whose most recent felony conviction was for possession of a firearm. *Id.*

Copeland had Thompson get out of the vehicle, patted him down for weapons, radioed for backup and had Thompson sit on the bumper of Copeland's patrol car while Copeland conducted an inventory search of Thompson's car. *Id.* at 585. During the search, Copeland saw a loaded revolver in the vehicle, which was 10 to 15 feet away from where Thompson was sitting, "on the bumper of Copeland's police cruiser, watched over by another deputy who had arrived for backup on the scene." *Id.* Copeland's conduct at this point was disputed by the parties – Copeland claimed that he unhostered and displayed his weapon, but did

18

not point it at Thompson. Thompson claimed that "Copeland pointed his gun at Thompson's head, demanded Thompson surrender, and threatened to kill him if he did not." *Id.*

The Ninth Circuit assumed that Thompson's version of events was true and held that a gun to the head constitutes excessive force "where the officers have an unarmed felony suspect under control, where they could easily have handcuffed the suspect while he was sitting on the squad car, and where the suspect is not in close proximity to an accessible weapon. *Id.* at 587. The Ninth Circuit nevertheless held that Copeland was entitled to qualified immunity because "Thompson's right not to have a gun pointed at him under the circumstance here was not clearly established at the time the events took place." *Id.*

Deputy Wharton had more reason to draw his weapon and point it at Mr. DeMers than Copeland had to draw his weapon and point it at Thompson. Unlike Thompson, Mr. DeMers was not checked for weapons. Indeed, Mr. DeMers refused to comply with Deputy Wharton's instruction to show his hands. Deputy Wharton therefore was not able to assure himself that Mr. DeMers was unarmed. Unlike Thompson, Mr. DeMers was standing by the Infiniti, within reaching distance of a weapon that may have been concealed there. Even if the Ninth Circuit had decided the *Thompson* case before November of 2013, that decision

19

would not have put Deputy Wharton on notice that pointing a gun at Mr. DeMers constituted excessive force in violation of Mr. DeMers's clearly established constitutional right to be free from unreasonable seizure.

Second Encounter

The Court agrees with Plaintiff's position that the events leading up to Deputy Wharton's second encounter with Mr. DeMers should all be considered in determining whether Deputy Wharton's decision to attempt to use a taser to seize Mr. DeMers on I 90 was reasonable under the circumstances. Deputy Wharton recognized the man he saw on I 90 as the driver of the Infiniti who had fled from him earlier that day. Having found a loaded magazine for an automatic pistol and a pair of brass knuckles during his search of the Infiniti, Deputy Wharton had reason to believe that Mr. DeMers could be armed. Given Mr. DeMers's choice to run away earlier in the day, Deputy Wharton also had reason to believe that Mr. DeMers might attempt to flee again. It was therefore reasonable for Deputy Wharton to draw his taser before confronting Mr. DeMers and to deploy his taser when Mr. DeMers ran away. Deputy Wharton is entitled to summary judgment because the undisputed facts demonstrate that he did not use excessive force during his second encounter with Mr. DeMers.

///

Even if a jury could find that Deputy Wharton's use of a taser on a suspect who had previously evaded arrest and was suspected of carrying a weapon was excessive, Deputy Wharton is entitled to summary judgment on the basis of qualified immunity for his conduct during his second encounter with Mr. DeMers.

Although the United States Court of Appeals for the Ninth Circuit decided a number of cases involving the use of tasers during the years preceding the incidents that led to the filing of this case, the Court has found no case sufficiently similar to the facts of this case as to have put Deputy Wharton on notice that his use of the taser violated Mr. DeMers's constitutional rights.

In 2010, the Ninth Circuit held that a single deployment of a taser in dart mode against an agitated but clearly unarmed man who was pulled over for a minor traffic violation and was not attempting to flee constituted excessive force. *Bryan v. MacPherson*, 630 F.3d 805, 822, 832 (9th Cir. 2010). Deputy Wharton got out of his car with his taser drawn because he "knew DeMers was a habitual traffic offender, was possibly armed, and had run from a previous stop, . . . ." (Doc. 17-1 at ¶ 14). Deputy Wharton fired the taser only after Mr. DeMers turned and began to run away; his actions were therefore not governed by the law established in *Bryan*.

///

More recently, the Ninth Circuit addressed the issue "whether police officers are entitled to qualified immunity when they're alleged to have caused the death of a suspect by using tasers repeatedly and simultaneously for an extended period." *Jones v. Las Vegas Metropolitan Police Dep't*, 873 F.3d 1123, 1126 - 27 (9th Cir. 2017). Jones ran away after being pulled over for a traffic stop. *Id.* at 1127. The Ninth Circuit held that the officer's initial use of the taser to subdue Jones was appropriate, but the continued use after back up arrived was not. *Id.* at 1130. Deputy Wharton's single and unsuccessful use of the taser, like the defendant's initial use of the taser in *Jones,* was not unreasonable and therefore did not violate Mr. DeMers's clearly established rights.

<u>Plaintiff's 42 U.S.C. § 1983 Claim against Undersheriff Johnson</u>

Plaintiff seeks to hold Undersheriff Johnson individually liable for violating Mr. DeMers's constitutional rights based on Undersheriff Johnson's supervision of Deputy Wharton. "In a § 1983 suit or a *Bivens* action – where masters do not answer for the torts of their servants – the term 'supervisory liability' is a misnomer." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Each government official individually named in § 1983 claim "is only liable for his or her own misconduct." *Id.* Undersheriff Johnson can only be held liable for Deputy Wharton's acts if he personally participated in Deputy Wharton's constitutional

22

violation or engaged in some "culpable action, or inaction" that caused Deputy

Wharton's constitutional violation. *Starr v. Baca*, 652 F.3d 1202, 1207 - 1208 (9th

Cir. 2011).

There are only five allegations in the First Amended Complaint specifically

naming Undersheriff Johnson: ¶ 9 identifies Johnson as a citizen of Montana and

an employee or agent of Jefferson County Sheriff's Department; ¶ 14 states that

Johnson served as a peace officer in the State of Montana at all times relevant to

the complaint; ¶ 20 states that Deputy Wharton impounded DeMers's vehicle

"after direction from defendant Johnson;" ¶ 27 states that "Defendants Wharton

and Johnson were employed by Defendants Jefferson county and the Jefferson

county sheriff's department" when they interacted with Mr. DeMers on November

8 and 9, 2013; and ¶ 45 states "Defendants Wharton and Johnson created a

foreseeable risk of physical and serious or severe emotional injury to plaintiff by

directly causing severe emotional distress that resulted in physical symptoms."

(Doc. 7).

None of these allegations establish that Undersheriff Johnson personally

participated in or caused Deputy Wharton's alleged constitutional violation. The

party moving for summary judgment can meet its burden by pointing out the

complete absence of evidence to prove an essential element of the non-moving

23

party's claim when, as in this case, the non-moving party will bear the burden of proof at trial. *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007). Undersheriff Johnson met this burden by pointing out the absence of specific factual allegations linking Undersheriff's Johnson's conduct to Deputy Wharton's in the First Amended Complaint.

Undersheriff Johnson is also entitled to qualified immunity. *See Felarca v. Birgeneau,* 891 F.3d 809, 822 (9th Cir. 2018)(applying qualified immunity to claims against supervisors). Although the first step in the qualified immunity analysis would normally be to determine whether Deputy Wharton, an officer supervised by Undersheriff Johnson, used excessive force, *id.,* this procedure is no longer mandatory. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009). The Court will proceed directly to the second prong. As discussed above, Plaintiff has failed to "identify a case where an officer acting under similar circumstances [to Deputy Wharton in either his first or second encounter with Mr. DeMers] was held to have violated the Fourth Amendment." *Felarca,* 891 F.3d at 822. Undersheriff Johnson, like Deputy Wharton, is entitled to summary judgment on the basis of qualified immunity.

### Plaintiff's 42 U.S.C. § 1983 Claim against Jefferson County

Plaintiff's § 1983 claim against Jefferson County is premised on the

allegations of the amended complaint that officials with final policy-making
authority endorsed Deputy Wharton's use of excessive force through their
policies, patterns, and practices, which included failure to properly train Deputy
Wharton. (Doc. 19 at 21 and 23).

A local government entity, in this case Jefferson County, can be held liable
under § 1983 only if a plaintiff can show that a policy, practice, or custom of that
entity was "a moving force behind a violation of constitutional rights." *Dougherty
v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). *See also Monell v. Dept. of
Social Services,* 436 U.S. 658, 690–94 (1978). The custom or practice must be "so
'persistent and widespread' that it constitutes a 'permanent and well settled
[county] policy,'" which means that liability "may not be predicated on isolated or
sporadic incidents." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting
*Monell,* 436 U.S. at 691).

"A [county's] culpability for a deprivation of rights is at its most tenuous
where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61
(2011). Liability can only be imposed for a local government's failure to
adequately train its employees "when the need for more or different training is so
obvious, and the inadequacy so likely to result in the violation of constitutional
rights that the local policymakers of [the local government entity] can reasonably

be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). The United States Supreme Court set this high standard to avoid diluting the requirement that a local government can be held liable only for an action or inaction that amounts to an official policy. *Clouthier v. County of Contra Costs*, 591 F.3d 1232, 1250 (9th Cir. 2010)(*overruled on another issue by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016)).

Jefferson County met its summary judgment burden by pointing out the absence of a factual basis for Plaintiff's general and conclusory allegations that the County's policies, patterns, and practices caused the violation of Mr. DeMers's rights. Plaintiff failed to identify a specific policy, practice or custom as the "moving force" behind Deputy Wharton's conduct in her response to the Jefferson County's motion for summary judgment, instead arguing that it is not plaintiff's burden to allege specific facts. (Doc. 19 at 23). Plaintiff is mistaken. To survive a motion to dismiss for failure to state a claim, a plaintiff must provide more than legal conclusions and "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When a party moves for summary judgment and points out a complaint's failure to state a claim, the plaintiff cannot fall back on the legal conclusions in the complaint to avoid summary judgment

26

The Court finds that no genuine issue of material fact precludes summary judgment in favor of Deputy Wharton, Undersheriff Johnson and Jefferson County on their Motion for Summary Judgment as to Plaintiff's' claims under 42 U.S.C. § 1983 and that they are entitled to judgment as a matter of law on those claims.

**STATE LAW CLAIMS**

Constitutional Tort Claim

Plaintiff bases her claim for violation of the Montana Constitution on the Montana Supreme Court's decision in *Dorwart v. Caraway*, 58 P.3d 128 (Mont. 2002). Since deciding *Dorwart*, the Montana Supreme Court has clarified that the constitutional tort theory is not available in Montana where "adequate remedies exist under statutory or common law." *Sunburst School Distr. No. 2 v. Texaco, Inc.*, 165 P.3d 1079, ¶ 64 (Mont. 2007), *see also Northern Cheyenne Tribe v. Roman Catholic Church*, 296 P.3d 450, ¶ 59 (Mont. 2013). As explained below, Plaintiff has adequate state law remedies in this case. Defendants are therefore entitled to summary judgment as to Plaintiff's claim that Defendants violated the Montana constitution.

Remaining State Law Claims

Defendants move for summary judgment on Plaintiff's remaining state law claims on the basis of the public duty doctrine. "The public duty doctrine provides

that a governmental entity cannot be held liable for an individual plaintiff's injury resulting from a governmental officer's breach of a duty owed to the general public rather than to the individual plaintiff." *Massee v. Thompson*, 90 P.3d 394, 403 (Mont. 2004). The Montana Supreme Court recognizes a "special relationship" exception to the public duty doctrine in four situations: "(1) where a statute intended to protect a specific class of persons from a particular type of harm imposes a duty; (2) where the government agent undertakes a specific action to protect a person or property; (3) where a government action reasonably induces detrimental reliance by a member of the public; and (4) where the government has actual custody of the plaintiff or a third person who harms the plaintiff." *Gonzalez v. City of Bozeman*, 217 P.3d 487, ¶ 20 (Mont. 2009). The Court is not persuaded that Deputy Wharton assumed a duty to protect Mr. DeMers by responding to a dispatch call. Were that the case, every officer responding to a call would have a special relationship to the person who either made or was the subject of the call.

The evolving nature of the public duty doctrine in Montana is demonstrated by a recent opinion issued by the Montana Supreme Court in response to a certified question from the United States Court of Appeals for the Ninth Circuit. *Bassett v. Lamantia*, 417 P.2d 299 (Mont. 2018). The Montana Supreme Court reformulated the question to ask: "Under Montana law, when a plaintiff claims he

28

was injured directly by an officer's affirmative acts, does the public duty doctrine exclude all duties that may arise pursuant to generally applicable principles of negligence?" *Id*. at ¶ 1  The Montana Supreme Court answered the question in the negative, *id*. at ¶ 2, and held that "the public duty doctrine . . . does not apply to exclude the legal duty an officer may owe to a person injured directly by the officer's affirmative actions." *Id*.

*Bassett* was decided after Defendants' summary judgment motion was fully briefed and the parties have not had the opportunity to address it.  The Court therefore finds that Defendants have not met their burden and are not entitled to summary judgment as to Plaintiff's remaining state law claims.

**CONCLUSION AND ORDER**

As explained above, Defendants are entitled to judgment as a matter of law as to Plaintiff's claims under 42 U.S.C. § 1983 and Plaintiff's constitutional tort claim under the Montana constitution but not as to Plaintiff's remaining state law claims.

Accordingly,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (Doc. 15) is GRANTED as to Counts I and II and DENIED as to Counts III, IV, and V of the First Amended Complaint.

The Court confirms the trial date of September 17, 2018, for trial of Plaintiff's remaining state law claims. The remaining deadlines set in the Court's Preliminary Scheduling Order (Doc. 12) remain in full force and effect.

It appearing to this Court that the case is now ready for a court-supervised settlement conference,

IT IS FURTHER ORDERED that this matter is referred to United States Magistrate Judge John Johnston for the purpose of conducting a settlement conference, which will be set down by him by subsequent order. Those individuals having ultimate settlement authority shall be present personally at the conference.

The Clerk is directed forthwith to notify United States Magistrate Judge Johnston of the entry of this order.

Dated this _____ day  of August, 2018.

CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE